**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

WILLIAM LEE BROWN,      )
                            )    Civil Action No. 16 – 63
             Petitioner,   )
                            )
        v.                )    Magistrate Judge Lisa Pupo Lenihan
                            )
MR. GARMON and THE      )
ATTORNEY GENERAL OF THE   )
STATE OF PENNSYLVANIA,    )
                            )
           Respondents.  )

## MEMORANDUM OPINION

Currently pending before the Court is a Petition for Writ of Habeas Corpus ("Habeas Petition") filed by Petitioner William Lee Brown (hereinafter referred to as "Petitioner", "Brown", "Appellant," or "Defendant") pursuant to 28 U.S.C. § 2254. (ECF No. 3). Petitioner challenges his judgment of sentence imposed after he was convicted in a non-jury trial of one count of first-degree murder, two counts of first-degree murder of an unborn child and one count of third-degree murder. For the following reasons, the Habeas Petition and a Certificate of Appealability will be denied.

**A.**     **Procedural Background**

**1.**     **Pre-trial and Trial Proceedings**

On October 27, 2003, Petitioner was charged by criminal information filed in the Court of Common Pleas of Allegheny County, Pennsylvania, Criminal Division, with one court of Criminal Homicide (18 Pa. C.S. § 2501(a)) and two counts of Criminal Homicide of an Unborn

Child (18 Pa. C.S. § 2604) in connection with the deaths of Tiffany Griffin and her unborn twins. (Docket Sheet at CP-02-CR-13412-2003, Res't Ex. 1, ECF No. 29-1, pp.1-23); (Criminal Information at CC No. 200313412, Resp't Ex. 2, ECF No. 291, pp.24-29). The Commonwealth gave notice of its intention to seek the death penalty. (Resp't Ex. 2, ECF No. 29-1, pp.27-28).

On January 6, 2004, Petitioner was charged by criminal information filed in the Court of Common Pleas of Allegheny County, Pennsylvania, Criminal Division, with one count each of Criminal Attempt (Homicide) (18 Pa. C.S. § 901(a)), Aggravated Assault (18 Pa. C.S. § 2702(a)(1)) and Burglary (18 Pa. C.S § 3502), in connection with the attempted murder of Carmen Griffin, the mother of Tiffany Griffin. (Docket Sheet at CP-02-CR- 15665-2003, Resp't Ex. 3, ECF No. 29-1, pp.30-46); (Criminal Information at CC No. 200315665, Resp't Ex. 4, ECF No. 29-1, pp.47-51). As a result of her injuries, however, Carmen Griffin died before trial, so the Commonwealth sought and was granted permission to withdraw the attempt and aggravated assault charges and charge Petitioner with Carmen Griffin's homicide. The criminal information was filed on April 8, 2005. (Docket Sheet at CP-02-CR-04266-2005, Resp't Ex. 5, ECF No. 29-1, pp.52-64); (Criminal Information at CC No. 200504266, Resp't Ex. 6, ECF No. 29-1, pp.65-69). The Commonwealth again gave notice of its intention to seek the death penalty. (Resp't Ex. 6, ECF No. 29-1, p.66).

On September 8, 2005, attorney John Kent Lewis, Esquire, filed an Omnibus Pre-Trial Motion seeking suppression of evidence and pre-trial habeas corpus relief, and giving notice of defendant's intention to pursue an insanity and/or mental infirmity defense. (Omnibus Pre-Trial Motion, Resp't Ex. 7, ECF No. 29-1, pp.70-73). An *Atkins*[1] hearing took place before the

---

[1] Atkins v. Virginia, 536 U.S. 304 (2002).

Honorable Lawrence J. O'Toole on July 23, 2007, during which argument was presented by the defense in an attempt to bar imposition of the death penalty on the basis that Petitioner was mentally retarded. Petitioner was represented at that hearing by attorney John Knorr, Esquire, and John Elash, Esquire. The Commonwealth was represented by Assistant District Attorney Lisa Pellegrini.

In November 2007, the court appointed new counsel, attorney Thomas N. Farrell, Esquire, to represented Petitioner at trial, and Attorney Knorr was to continue to represent Petitioner during the penalty phase.

On February 28, 2008, a suppression hearing took place before Judge O'Toole, with Attorney Farrell representing Petitioner and ADA Pellegrini appearing on behalf of the Commonwealth. The following day, Judge O'Toole denied the defense's motion to suppress and request for pre-trial habeas corpus relief. Judge O'Toole also denied the defense's motion to bar the imposition of the death penalty. (Orders, Resp't Ex. 8, ECF No. 29-1, pp.74-76).

The case was reassigned to the Honorable Jeffrey A. Manning on October 27, 2008.

On March 31, 2009, Petitioner, represented by Attorney Knorr and Attorney Farrell, appeared before Judge Manning and waived his right to a jury trial. (Waiver of Jury Trial and Explanation of Defendant's Right, Resp't Ex. 9, ECF No. 29-1, pp.77-86).

On April 7, 2009, Petitioner, represented by Attorney Knorr and Attorney Farrell, appeared before Judge Manning for a non-jury trial. ADA Pellegrini represented the Commonwealth. On April 16, 2009, at the close of the trial, the court found Petitioner guilty of first-degree murder for the death of Tiffany Griffin, guilty of two counts of first-degree murder for the deaths of her unborn children, and guilty of third-degree murder for the death of Carmen Griffin. He was acquitted of burglary.

On May 28, 2009, in a separate proceeding, the court found that mitigating circumstances were not outweighed by the aggravating circumstances and therefore did not impose the death penalty but sentenced Petitioner instead to three consecutive terms of life imprisonment for the first-degree murders of Tiffany Griffin and her unborn children. The court also imposed a consecutive term of 20 to 40 years' imprisonment for the third-degree murder of Carmen Griffin. (Order of Sentences, Resp't Ex. 10, ECF No. 29-1, pp.87-93). No post-sentence motions were filed.

## 2. **Direct Appeal Proceedings**

On June 11, 2009, Attorney Farrell filed a Notice of Appeal on Petitioner's behalf only as to CP-02-CR-13412-2003, and the appeal was docketed at Pennsylvania Superior Court docket No. 1021 WDA 2009. (Superior Court Docket Sheet, Resp't Ex. 11, ECF No. 29-2, pp.1-6). On January 19, 2010, Judge Manning filed his Opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925(a). (Resp't Ex. 12, ECF No. 29-2, p.7-18). By order dated July 13, 2010, Petitioner was granted leave to amend the Notice of Appeal to include both CP-02-CR- 15665-2003 and CP-02-CR-04266-2005. (Resp't Ex. 1, ECF No. 29-1, p.14). The Appellant's Brief was filed on August 2, 2010 (Resp't Ex. 13, ECF No. 29-2, pp.19-90), and the Appellee's Brief was filed on October 5, 2010 (Resp't Ex. 14, ECF No. 29-3, pp.1-59). On February 25, 2011, the Superior Court issued a Memorandum Opinion rejecting Petitioner's challenge to the sufficiency of the evidence as to the homicide charges involving Tiffany Griffin and her unborn children but remanded the matter so that Judge O'Toole could make findings of fact and conclusions of law with respect to his denial of Petitioner's pre-trial motion to suppress. (Resp't Ex. 15, ECF No. 29-4, pp.1-9). On March 21, 2011, in accordance with the remand, Judge O'Toole issued his opinion. (Resp't Ex. 16, ECF No. 29-4, pp.10-14). A supplemental brief was

4

filed by Appellant on April 4, 2011 (Resp't Ex. 17, ECF No. 29-4, pp.15-32) and an amended brief was filed by Appellee on May 25, 2011 (Resp't Ex. 18, ECF No. 29-4, pp.33-51). On June 16, 2011, the Superior Court filed a second Memorandum Opinion, which affirmed Petitioner's judgment of sentence. (Resp't Ex. 19, 29-4, pp.52-56).

On July 13, 2011, Attorneys Farrell and Knorr filed a Petition for Allowance of Appeal ("PAA") in the Pennsylvania Supreme Court (Resp't Ex. 21, ECF No. 29-5, pp.4-75), which was docketed at No. 358 WAL 2011. (Pennsylvania Supreme Court Docket Sheet, Resp't Ex. 20, ECF No. 29-5, pp.1-3). The Commonwealth filed a "No Answer" Letter in response to the PAA on July 15, 2011. (Resp't Ex. 22, ECF No. 29-5, p.76). The Pennsylvania Supreme Court denied the PAA by Order dated October 25, 2011. (Resp't Ex. 23, ECF No. 29-5, p.77).

### 3. Post-conviction Proceedings

On July 13, 2012, Petitioner filed a *pro se* petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA"). (Resp't Ex. 1, ECF No. 29-1, p.15). The PCRA court appointed attorney Ryan James, Esquire, who filed an Amended PCRA Petition on behalf of Petitioner on September 24, 2013. (Resp't Ex. 24, ECF No. 29-6, pp.1-16). The Commonwealth filed its Answer on November 25, 2013. (Resp't Ex. 25, ECF No. 29-6, pp.17-58). On February 13, 2014, Judge Manning issued a Notice of Intent to Dismiss the Amended PCRA Petition. (Resp't Ex. 26, ECF No. 29-6, pp.59-61). By order dated April 14, 2014, Judge Manning dismissed the Amended PCRA Petition. (Resp't Ex. 27, ECF No. 29-6, pp.62-63). Three days later, on April 17, 2014, Attorney James filed a Reply *Nunc Pro Tunc* to the PCRA court's Notice of Intent to Dismiss (Resp't Ex. 28, ECF No. 29-6, pp.64-69), and he filed a Motion for Reconsideration on May 5, 2014 (Resp't Ex. 29, ECF No. 29-6, pp.70-74). The PCRA court did not rule on that motion.

On May 16, 2014, Attorney James filed a Notice of Appeal in the Superior Court on Petitioner's behalf, which was docketed at No. 801 WDA 2014. (Superior Court Docket Sheet, Resp't Ex. 30, ECF No. 29-7, pp.1-4). The Brief for Appellant was filed on December 15, 2014 (Resp't Ex. 31, ECF No. 29-7, pp.5-41) and the Brief for Appellee was filed on January 14, 2015 (Resp't Ex. 32, ECF No. 29-81-62). On April 24, 2015, the Superior Court issued a Memorandum Opinion affirming the denial of PCRA relief. (Resp't Ex. 33, ECF No. 29-8, pp.63-79).

On May 21, 2015, Petitioner filed a PAA in the Pennsylvania Supreme Court (Resp't Ex. 35, ECF No. 29-9, pp.4-40), which was docketed at No. 198 WAL 2015 (Resp't Ex. 34, ECF No. 29-9, pp.1-3). The Commonwealth filed a "No Answer" Letter in response to the PAA on May 22, 2015 (Resp't Ex. 36, ECF No. 29-9, p.41), and the PAA was denied by order dated December 7, 2015 (Resp't Ex. 37, ECF No. 29-9, p.42).

On October 8, 2015, while Petitioner's PAA was still pending in the Pennsylvania Supreme Court, Petitioner filed a second *pro se* PCRA petition. (Resp't Ex. 38, ECF No. 29-10, pp.1-10). On November 16, 2015, the PCRA court issued a Notice of Intent to Dismiss the PCRA petition (Resp't Ex. 39, ECF No. 29-10, pp.11-12), to which Petitioner filed a response on December 11, 2015 (Resp't Ex. 40, ECF No. 29-10, pp.13-22). The PCRA court dismissed the petition on December 22, 2015. (Resp't Ex. 41, ECF No. 29-10, p.23).

On January 14, 2016, Petitioner filed his Habeas Petition and Brief in Support thereof in this case. (ECF Nos. 1, 1-1). They were docketed after Petitioner paid the filing fee on February 5, 2016. (ECF Nos. 3, 4). Respondents filed their Answer to the Habeas Petition on January 23, 2017. (ECF No. 29). Petitioner filed a Reply to the Respondents' Answer on February 27, 2017

(ECF No. 32), and he filed two Addendums to his Habeas Petition on January 24, 2018 and April 27, 2018, respectively (ECF Nos. 39, 40).

On January 20, 2016, Petitioner filed a Notice of Appeal in the Superior Court, which was docketed at No. 180 WDA 2016. (Superior Court Docket Sheet, Resp't Ex. 42, ECF No. 29-10, pp.24-27). His Appellant Brief was filed on April 13, 2016 (Resp't Ex. 43, ECF No. 29-10, pp.28-60) and the Brief for Appellee was filed on May 13, 2016 (Resp't Ex. 44, ECF No. 29-11, pp.1-37). On August 4, 2016, the Superior Court affirmed the dismissal of Petitioner's second PCRA petition. (Resp't Ex. 47, ECF No. 29-11, pp.55-60). Petitioner did not file a PAA in the Pennsylvania Supreme Court.

On February 23, 2016, while the appeal of his second PCRA petition was still pending in the Superior Court, and after he filed his Habeas Petition in this case, Petitioner filed a third *pro se* PCRA petition, which he titled "Motion for Post Conviction DNA Testing." (Resp't Ex. 45, ECF No. 29-11, pp.38-53). The PCRA court dismissed the Motion without prejudice on May 6, 2016. (Resp't Ex. 46, ECF No. 29-11, p.54).

### B. Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court may overturn a state court's resolution of the merits of a constitutional issue only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The phrase "clearly established Federal law," as the term is used in Section 2254(d)(1) is restricted "to the holdings, as opposed to the dicta of [the United States Supreme Court] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 365 (2000).

If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court decision is not entitled to deference under AEDPA and the federal habeas court proceeds to a *de novo* evaluation of the constitutional claim on the merits. *See* Tucker v. Superintendent Graterford SCI, 677 F. App'x 768, 776 (3d Cir. 2017) (citing Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must then resolve the claim without the deference AEDPA otherwise requires."). Indeed, the Third Circuit recently explained that,

> [w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it is not alone sufficient. That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," Williams, 529 U.S. at 389, 120 S.Ct. 1495. *See also* Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard"). Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim *de novo* to evaluate if a constitutional violation occurred. *See* Lafler v. Cooper, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote omitted).

The AEDPA further provides for relief if an adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under § 2254(d)(2), a state court decision is based on an "unreasonable determination of the facts" if the state court's factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding,"

which requires review of whether there was sufficient evidence to support the state court's factual findings. *See* <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003). Within this overarching standard, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision. Here, § 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence. <u>Lambert v. Blackwell</u>, 387 F.3d 210, 235 (3d Cir. 2004).

## C.    <u>Discussion</u>

Petitioner raises five claims for relief in his Habeas Petition: (1) the Commonwealth failed to present sufficient evidence to support the first-degree murder conviction, (2) the trial court erred in denying the defense's pre-trial motion to suppress, (3) the trial court erred in accepting Petitioner's waiver of his right to a jury trial, (4) counsel was ineffective for failing to call two alibi witnesses, and (5) PCRA counsel was ineffective for failing to file a timely second amended PCRA petition raising additional claims. Petitioner also presents a sixth claim in his two addendums asserting that DNA testing would prove his actual innocence.

### 1.    <u>Claim One:  Sufficiency of the Evidence</u>

Petitioner's first claim is that the Commonwealth failed to present sufficient evidence to find beyond a reasonable doubt that he had the specific intent to kill Tiffany Griffin. In state court, Petitioner properly and fairly presented this claim in his direct appeal proceedings and it was adjudicated on the merits by the Superior Court. Therefore, this claim is deemed exhausted for purposes of federal habeas review. The inquiry before this Court is whether the Superior Court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

The clearly established federal law to analyze a sufficiency of the evidence claim is set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979), where the United States Supreme Court held that "in a challenge to a state conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilty beyond a reasonable doubt." In a federal habeas corpus proceeding where the sufficiency of the evidence is in contention:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt . . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

<u>Jackson</u>, 443 U.S. at 318-19 (internal citations omitted) (emphasis in original). *See also* <u>Robertson v. Klem</u>, 580 F.3d 159, 165 (3d Cir. 2009); <u>Orban v. Vaughn</u>, 123 F.3d 727, 731-33 (3d Cir. 1997).

In applying the <u>Jackson</u> standard, the reviewing court must consider each substantive element of the criminal offense at issue as defined under state law. <u>Coleman v. Jackson</u>, 132 S. Ct. 2060, 2064 (2012); <u>Jackson</u>, 443 U.S. at 324, n.16. "While the elements of a criminal conviction are to be defined by state law, a reviewing court's determination of whether sufficient evidence was produced to satisfy each element is governed by federal law. <u>Vaughter v. Folino</u>, 2014 WL 1152540, at *15 (E.D. Pa. Mar. 24, 2014) (citing <u>Coleman</u>, 132 S. Ct. at 2064).

### a. **"Contrary to"**

The Supreme Court has identified two scenarios where a state court decision will fall into section 2254(d)(1)'s "contrary to" clause. First, a state court decision will be "contrary to" clearly established federal law when the court "applies a rule that contradicts the governing law

set forth in [Supreme Court] cases." <u>Williams v. Taylor</u>, 529 U.S. 362, 405 (2000).  It set forth

the following example where a state court decision would be "contrary to" <u>Strickland v.</u>

<u>Washington</u>, 466 U.S. 668 (1984), the familiar clearly established federal law governing

ineffective assistance of counsel claims.

> If a state court were to reject a prisoner's claim of ineffective assistance of
> counsel on the grounds that the prisoner had not established by a preponderance
> of the evidence that the result of his criminal proceeding would have been
> different, that decision would be 'diametrically different,' 'opposite in character
> or nature,' and 'mutually opposed' to our clearly established precedent because
> we held in <u>Strickland</u> that the prisoner need only demonstrate a 'reasonable
> probability that . . . the result of the proceeding would have been different.'

<u>Williams</u>, 529 U.S. at 405-06 (internal citations omitted).  The Supreme Court said that a state

court decision will also be "contrary to" clearly established federal law if it "confronts a set of

facts that are materially indistinguishable from a decision of this Court and nevertheless arrives

at a result different from our precedent."  <u>Id</u>. at 406.

In this case, both the trial judge (in his Pa. R.A.P. 1925(a) Opinion) and the Pennsylvania

Superior Court applied a well-known Pennsylvania test for evaluating a challenge to the

sufficiency of the evidence set forth by the Pennsylvania Superior Court in previous decisions.

*See* (Resp't Ex. 12, ECF No. 29-2, p.10) (citing <u>Commonwealth v. Passmore</u>, 857 A.2d 697, 706

(Pa. Super. Ct. 2004).  *See also* (Resp't Ex. 15, ECF No. 29-4, pp.4-5) (citing <u>Commonwealth v.</u>

<u>King</u>, 990 A.2d 1172, 1178 (Pa. Super. Ct. 2010).  While neither state court cited to <u>Jackson</u>, the

Third Circuit has found that the Pennsylvania test for sufficiency of the evidence challenges is

identical to the federal standard set forth in <u>Jackson</u>.  *See* <u>Evans v. Court of Common Pleas,</u>

<u>Delaware County</u>, 959 F.2d 1227, 1233 (3d Cir. 1992) ("the formulation of the Pennsylvania test

for insufficiency of the evidence is almost identical to that under federal law").  As such, the

adjudication of this claim by the Pennsylvania Superior Court was not contrary to clearly

established federal law.

### b. **"Unreasonable application of"**

The Court's next inquiry is whether the adjudication of Petitioner's sufficiency of the

evidence claim was an unreasonable application of <u>Jackson</u>. The Supreme Court has said that

under the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1), "a federal habeas court

may not grant relief simply because that court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law erroneously or incorrectly.

Rather, that application must also be unreasonable." <u>Williams</u>, 529 U.S. at 411. The Supreme

Court later expanded on this interpretation of the "unreasonable application" clause explaining

that the state court's decision must be "objectively unreasonable," not merely wrong; even "clear

error" will not suffice. <u>Locklyer v. Andrade</u>, 538 U.S. 63, 75 (2003). "As a condition for

obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

ruling on the claim being presented in federal court was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011).

To have been entitled to relief on this claim in his direct appeal, Petitioner had to show

that the evidence, viewed in the light most favorable to the Commonwealth, was insufficient to

enable a fact-finder to find beyond a reasonable doubt that he acted with the specific intent to kill

Tiffany Griffin. The Superior Court, as required, identified the elements of first-degree murder

and quoted the applicable statutory language defining an "intentional killing." (Resp't Ex. 15,

ECF No. 29-4, pp.3-4). It also noted the defenses of diminished capacity and voluntary

intoxication and set forth the evidence which a defendant must show in order for said defenses to be effective.  Id. at p.4.

Petitioner argued that the evidence did not prove he had the specific intent to kill Tiffany Griffin due to his low intellectual functioning and his excessive intoxication on the day of the killings.  In his Pa. R.A.P. 1925(a) Opinion, Judge Manning, who sat as the finder of fact for Petitioner's trial, recounted the evidence and explained why he believed the Commonwealth had proved beyond a reasonable doubt that Petitioner acted with the specific intent to kill Griffin.

Specific intent for a homicide need not be shown by direct evidence.  In homicide cases "[w]hen there is no direct evidence of intent to kill the fact finder may glean necessary intent from the act itself and from all surrounding circumstances" Commonwealth v. Hawkins, 701 A.2d 492, 500 (Pa. 1997).  See also Commonwealth v. Griffin, 684 A.2d 589 (Pa. Super. 1996) (For purposes of criminal homicide, the element of intent may be proven by circumstantial evidence).  Here, the evidence established that [t]he defendant was angry with the victims, Tiffany Griffin and her mother, Carmen Griffin because he believed that they had been talking about him.  Two witnesses, Jamal Williams and Calvin Harshaw, testified that Tiffany had told them that the defendant threatened her.  Williams said that Tiffany told him that the defendant said he was going to kill her, her mother and her babies.  The evidence established that on the day of the killing the defendant entered the victims' residence by cutting a hole in a screen in the bathroom window.  He initially encountered Carmen Griffin and beat her into unconsciousness on the second floor.  She would never regain consciousness and died from the injuries inflicted in the beating.

The defendant then found Tiffany Griffin and proceeded to also beat her with the cane.  He savagely struck her repeatedly in the head.  At one point, she tried to escape but he[] pursued her and dragged her back into the house and resumed his assault.  He beat her until she was dead, or nearly dead.

According to forensic pathologist Dr. Abdulrezak M. Shakir, Tiffany Griffin suffered at least 14 lacerations to her head and trunk, inflicted with a blunt instrument.  Her right eyeball was destroyed and large chunks of hair were torn from her head.  She also suffered a stab wound to the groin area.  He concluded that her death was caused by blunt force trauma to her brain.  The stab wound was not contributory.

The defendant also gave a statement to police following his arrest in which he stated that he stood at the front door of the Griffin residence and heard the victims talking about him.  He said that he returned home and began drinking alcohol.  As he did, he got "madder and madder" until he decided to return and "hurt them".  He said that he found a

knife in the street and used that to cut the screen and gain entry to the residence. He first encountered Carmen Griffin in an upstairs bedroom and beat her. He then found Tiffany Griffin and began to beat her as well. He said that he used a cane, swinging it repeatedly in an overhead motion, hitting her in the head and body. He told Detective Logan that he was not drunk, having had only two drinks that day before going to the Griffin home.

The defendant presented expert testimony in an attempt to show that he did not have the capacity to form the specific intent to kill. Clinical neuropsychologist Michael Franzen, PhD., testified that the defendant had a significant alcohol abuse problem, having started drinking at age 12. He said that the defendant also had severe limitations in mental cognition. His full scale IQ was found to be in the range of 67 to 72.

Herbert Levit, a clinical and forensic psychologist, testified that the defendant had developed organic brain damage due to excessive alcohol use. He also concluded that the defendant was mildly mentally retarded. He believed that, because of these impairments, the defendant was not capable of forming the specific intent to kill.

The Commonwealth presented psychiatrist Bruce Wright. Dr. Wright evaluated the defendant[,] reviewed his mental health records and also reviewed the reports [of] Drs. Levit[] and Franzen. He concluded that although the defendant did have 'borderline' intellectual functioning, he was not mentally retarded. He stated that the defendant did have the "cognitive capacity to form a specific intent to kill." The defense also presented several witnesses who stated that the defendant was always heavily intoxicated and was extremely drunk on the day of the killings.

The evidence of specific intent was both circumstantial and direct. According to one witness, the defendant told Tiffany Griffin that he was going to kill her, her mother and her babies. He told Detective Logan that he went to the house to "hurt them." The savagery of the assault was also strong circumstantial evidence of intent to kill. He struck her repeatedly with a heavy, blunt object in her head. A specific intent to kill can be inferred from the circumstances surrounding the incident. Because a person generally intends the consequences of his act, specific intent to kill may be inferred from the fact that the accused used a deadly weapon to inflict injury to a vital part of the victim's body. Commonwealth v. Sattazahn, 631 A.2d 597, 602 (Pa. Super. 1993), *appeal dismissed*, 652 A.2d 293 (Pa. 1994). The cane, used the way defendant used it, was a deadly weapon. The natural consequence of repeatedly striking someone about the head with it is death or serious bodily injury. The circumstances of the beating, standing alone, would have been sufficient to establish a specific intent to kill. When those circumstances are considered along with the statement he made to the victim that he would kill her, her mother and her babies and his statement that he went to the victim's house to hurt them, they establish specific intent to kill.

The defendant presented evidence concerning his mental status as well as witnesses who claimed that he was severely intoxicated the night of the murder.

Although there was evidence which established that the defendant did have impaired intellectual functioning, this Court found Dr. Wright's testimony more credible and persuasive on the issue of whether the defendant's impairment was so severe to render him unable to form the specific intent to kill. Based on that credibility determination, the Court concluded that the defendant's mental impairments did not render him unable to form the specific intent to kill Tiffany Griffin. The evidence of the defendant's intoxication was also determined not to be credible. The officers who arrested the defendant did not note that he appeared intoxicated and the defendant told them that he had only had two drinks before entering the Griffin residence. The defendant's ability [to] surreptitiously gain entry to the residence, and his ability to carry out the savage attack on two people also suggests that he was not as intoxicated as his witnesses suggested. The Commonwealth established, beyond a reasonable doubt, that the defendant did possess, and was capable of possessing, the specific intent to kill Tiffany Griffin.

(Resp't Ex. 12, ECF No. 29-2, pp.11-14). On appeal, the Superior Court found as follows:

Appellant offered lay testimony indicating he was extremely intoxicated during the hours leading up to the killing of Tiffany Griffin and her two unborn children. Appellant also presented expert testimony that he was mildly mentally retarded and had suffered organic brain damage from years of alcohol abuse. It was the opinion of Appellant's expert that, due to Appellant's limited intellectual functioning and his intoxication, he could not form the specific intent to kill at the time of the incident.

The Commonwealth offered expert testimony that, while Appellant had borderline intellectual functioning, he did have the mental capacity to form the specific intent to kill. The Commonwealth also offered testimony from police that Appellant did not seem to be intoxicated when he was arrested, although that arrest appears to have taken place some fourteen hours after the killings. Police also testified Appellant stated that he had consumed only two alcoholic drinks on the day before the killings.

The trial court found the Commonwealth's expert more believable and persuasive on the question of Appellant's ability to form the intent to kill. Also, the court determined the evidence of Appellant's extreme intoxication was not credible. In this regard, the court noted the circumstances of the incident suggested Appellant was not as drunk as his witnesses claimed. For example, Appellant surreptitiously gained entry into Griffin's residence by using a knife to cut a screen. Appellant encountered Griffin's mother and beat her. Appellant also found Griffin, beat her, followed her out of the house when she tried to escape, pulled her back into the home, and resumed the assault. During a significant portion of the beatings, Appellant used a wooden cane. The trial court believed the foregoing conduct evidenced a capacity to function in a way belying Appellant's claim of excessive intoxication.

It is plain that, in large measure, the determination by the trial court, sitting as factfinder, was based on an evaluation of the credibility and weight of the evidence: the court accepted the Commonwealth's testimony that Appellant was able to form the intent to kill; the court disbelieved Appellant's contrary evidence, both expert and lay. It is not for us to disturb such determinations. Certainly, we cannot say that the evidence concerning Appellant's mental capacity was so weak and inconclusive that no probability of guilt could be based thereon. Thus, viewing the evidence in the light most favorable to the Commonwealth, we find the evidence was sufficient to [ ] support the convictions. Appellant's sufficiency claim therefore fails.

(Resp't Ex. 15, ECF No. 29-4, pp.5-6).

The above analysis shows that in accordance with the proper standard in reviewing Petitioner's sufficiency of the evidence claim, the state courts viewed the evidence that was admitted at trial related to Petitioner's intent to kill Tiffany Griffin, including evidence presented to support his claims of diminished capacity and voluntary intoxication, and reasonably determined that the evidence was sufficient to enable the fact-finder to find beyond a reasonable doubt that he did specifically intend to kill her. Notwithstanding the fact that Petitioner's Brief is void of any real factual support for this claim,[2] in no way can it be said that the Superior Court's determination was the result of an objectively unreasonable application of clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on this claim, nor is he entitled to relief to the extent that he argues he is under 28 U.S.C. § 2254(d)(2).

## 2. Claim Two: Denial of Motion to Suppress

Petitioner's second claim is that the trial court erred in not suppressing his custodial statement to police. Specifically, on direct appeal, Petitioner argued that the interviewing

---

[2] In his Brief, Petitioner engages in a lengthy discussion of the evidence presented at trial, but none of that evidence relates to whether he had the specific intent necessary to support a conviction for the first-degree murder of Tiffany Griffin.

detective, Detective Dennis Logan, read him his <u>Miranda</u>[3] rights too quickly for him to understand and either told him what to say during the interrogation or at least lead him into giving certain answers. Petitioner also complained about the conditions and length of the interrogation, asserting that it took place in a small room, that he was kept in the room alone for an extended period of time before questioning, and that the questioning itself was lengthy. Lastly, he argued that he was intoxicated at the time of his arrest and/or interview and, although he may have sobered somewhat by the time he actually made his taped statement, the combination of his intoxication, his limited intellect and all of the aforesaid circumstances of the interrogation rendered his statement involuntary. *See* Resp't Ex. 19, ECF No. 29-4, p.52-53.

When Petitioner raised this claim on direct appeal, the Superior Court remanded the case for the preparation of a trial court opinion because Judge O'Toole, who had presided over the suppression hearing before the case was transferred to Judge Manning for trial, had not made factual findings or conclusions of law and did not issue an opinion as to why Petitioner's statement was not to be suppressed. *See* Resp't Ex. 15, ECF No. 29-4, pp.8-9. Once remanded, Judge O'Toole issued an opinion making the following findings of fact:

1. The Defendant was arrested on September 16, 2003 pursuant to an arrest warrant for a probation violation unrelated to this case.

2. After the Defendant was arrested, City of Pittsburgh Police Detectives Hitchings and Canofari obtained a search warrant for the residence located at 342 Renova Street, Pittsburgh.

3. The Defendant was interviewed at the police station by Detective Dennis Logan.

4. Prior to beginning the interview, Detective Logan introduced himself and informed the Defendant that he was investigating the death of Tiffany Griffin.

---

[3] <u>Miranda v. Arizona</u>, 382 U.S. 436 (1966).

He inquired if the Defendant needed to use the restroom or if he wanted something to eat or drink.

5. Detective Logan did not detect any odor of alcohol on the Defendant's breath and the Defendant did not appear to be under the influence of narcotics. Also, the Defendant denied having used any drugs or alcohol.

6. Detective Logan provided the Defendant with the standard waiver of rights form used by the City of Pittsburgh Police Department. He read the form to the Defendant, who provided the answers to the questions. The Defendant then signed the bottom of the form and agreed to speak with the Detective.

7. The Defendant was not restrained during the interview; however, he was in custody due to the warrant for violation of probation.

8. Detective Logan took notes during the interview. At the conclusion of the interview, Detective Logan reviewed his notes with the Defendant and the Defendant signed the bottom of the notes.

9. At the conclusion of the oral interview, the Defendant agreed to place his statement on an audiotape. That tape was transcribed.

10. At the request of the defense, the Court listened to the CD containing the Defendant's statement to Detective Logan.

(Resp't Ex. 16, ECF No. 29-4, pp.12-13) (internal citations to record omitted). Judge O'Toole also made the following conclusions of law.

1. In determining the voluntariness of a confession and the waiver of Miranda rights, a court must consider and evaluate the totality of the circumstances attending the confession and the waiver of rights. Commonwealth v. Nester, 709 A.2d 879 (Pa. 1998).

2. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. Id.

3. Factors which must be looked to in reaching a determination that a confession is voluntary under the totality of the circumstances include the following: the duration and means of interrogation, the physical and psychological state of the accused, the conditions attendant to the detention, the attitude of the interrogator, and any and all factors that could drain a person's ability to withstand suggestion and coercion. Id.

(Resp't Ex. 16, ECF No. 29-4, pp.13-14). After reviewing the suppresion hearing transcript, Judge O'Toole determined that denial of the suppression motion was proper for the following reasons.

> . . . . First, Detective Logan testified credibly that the Defendant was not under the influence of drugs or alcohol at the time of his interview with the police. Second, the Court did not detect any slurring of words by the Defendant on the audio CD of the interview. Third, the Defendant's constitutional rights were clearly and thoroughly explained to him by the Detective prior to the interview. Fourth, the Defendant denied being under the influence of drugs or alcohol. Fifth, the Defendant was given the Miranda warning twice. He was read his rights prior to the initial oral interview and then a second time prior to the taped statement. He stated that he understood his rights on both occasions and he was willing to waive his rights and talk to the police. Thus, viewing the totality of the circumstances, the Court finds that the Defendant's waiver of his rights was knowing, intelligent, and voluntary.

(Resp't Ex. 16, ECF No. 29-4, p.14). Although Judge O'Toole "did not specifically recite or explicitly respond to each of the factual particulars which [Petitioner] list[ed] as bearing upon the validity of his Miranda waiver," the Superior Court determined that Judge O'Toole applied the correct law regarding the evaluation of the voluntariness of a custodial statement and that, read as a whole, his opinion evidenced "the court's consideration of the totality of the relevant circumstances." (Resp't Ex. 19, ECF No. 29-4, p.55). After it too listened to the recording of Petitioner's custodial statement, the Superior Court concluded that Judge O'Toole's factual findings were supported by the record and that his legal conclusions drawn from those findings were not erroneous. Id.

The clearly established federal law at issue here stems from Miranda, wherein the Supreme Court held that a criminal defendant may only waive his Fifth Amendment right to have an attorney present during custodial interrogation if "the waiver is made voluntarily,

knowingly and intelligently." 384 U.S. at 444. The Supreme Court has stated that a valid

Miranda waiver has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it
> was the product of a free and deliberate choice rather than intimidation, coercion,
> or deception. Second, the waiver must have been made with a full awareness of
> both the nature of the right being abandoned and the consequences of the decision
> to abandon it. Only if the "totality of the circumstances surrounding the
> interrogation" reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda* rights have been
> waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (quoting Fare v. Michael C., 442 U.S. 707, 725

(1979)). "The ultimate question in the voluntariness calculus is 'whether, under the totality of

the circumstances, the challenged confession was obtained in a manner compatible with the

requirements of the Constitution.'" Fahy v. Horn, 516 F.3d 169, 194 (3d Cir. 2008) (quoting

Miller v. Fenton, 474 U.S. 104, 112 (1985)).

Because this claim was adjudicated on the merits in state court, it is entitled to deference

under AEDPA, and, in order for Petitioner to overcome that deference, he must establish that the

state court's determination was "contrary to" clearly established federal law or reflected "an

unreasonable application of" that law. 28 U.S.C. § 2254(d)(1). In doing so, the appropriate

focus of habeas corpus review is the suppression hearing conducted in the state trial court and the

findings of fact made by the court in denying the motion to suppress. Schmidt v. Hewitt, 573

F.2d 794, 798 (3d Cir. 1978).

### a. **"Contrary to"**

Consistent with the court's instructions in Schmidt, this Court looks to the suppression

hearing and the court's findings of facts to determine whether the state court's adjudication of

this claim was "contrary to" the aforementioned applicable federal law. In evaluating this claim

on direct appeal, the Superior Court did not cite to any United States Supreme Court precedent. Instead, the court appropriately relied on its own state courts cases, which also articulated the proper federal standard. *See* Resp't Ex. 19, ECF No. 29-4, p.54 (citing <u>Commonwealth v. Jones</u>, 683 A.2d 1181, 1189 (Pa. 1996) ("The test for determining voluntariness of a confession and whether an accused knowingly waived his or her rights looks to the totality of the circumstances surrounding the giving of the confession. Some of the factors to be considered include: the duration and means of interrogation; the accused's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any and all other factors which may serve to drain one's powers or resistance to suggestion and coercion.")

Based on the principles already articulated with respect to claims involving the waiver of <u>Miranda</u>, it is clear that the state court's decision in this case complies with the United States Supreme Court's mandate that courts consider the "totality of the circumstances" surrounding an interrogation when determining whether a defendant properly waived his <u>Miranda</u> rights. Therefore, the state court's adjudication of this claim was not "contrary to" clearly established federal law.

### b. "Unreasonable application of"

As he did in his direct appeal proceedings, Petitioner attacks the findings made by Judge O'Toole with respect to the "totality of the circumstances" surrounding Petitioner's interrogation and <u>Miranda</u> wavier. However, Judge O'Toole's findings related to Petitioner's recorded interview with Detective Logan and the testimony given at the suppression hearing, such as the circumstances of the interrogation and the credibility of the witnesses who testified, are treated as presumptively correct and Petitioner cannot rebut that presumption of correctness absent clear

and convincing evidence, which he has not put forth. *See* 28 U.S.C. § 2254(e)(1). While

Petitioner is correct that Judge O'Toole did not explicitly address his arguments concerning his

low intellectual functioning and how it interfered, if at all, with the voluntariness of his Miranda

wavier, the Superior Court noted this fact but concluded that "read as a whole [Judge O'Toole's]

opinion does evidence the court's consideration of the totality of the relevant circumstances."

(Resp't Ex. 19, ECF No. 29-4, p.55).

In this case, the factual findings on the relevant subsidiary issues leaves little room for

Petitioner's argument that he did not voluntarily waive his Miranda rights. The state courts

applied the correct legal standard derived from the clearly established federal law governing

claims challenging a defendant's Miranda waiver, and its decision was the result of an

objectively reasonable application of that law.

Furthermore, Petitioner's reliance on his mental deficiencies, such as mental retardation

and/or borderline intellectual functioning, as the primary reason for why his Miranda waiver was

involuntary is without merit. The Supreme Court has stated that a defendant's mental condition

may serve as a "significant factor in the 'voluntariness' calculus," but such mental condition "by

itself and apart from its relation to official coercion, should [never] dispose of the inquiry into

constitutional 'voluntariness.'" Colorado v. Connelly, 479 U.S. 157, 164 (1986) (citing Spano v.

New York, 360 U.S. 315 (1959)). "[W]hile mental condition is surely relevant to an individual's

susceptibility to police coercion, mere examination of the confessant's state of mind can never

conclude the due process inquiry." Id. at 165. The Supreme Court has therefore held that

"coercive police activity is a necessary predicate to the finding that a confession is not

'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at

167.

In this case, both Judge O'Toole and the Superior Court listened to the audio taped

statement of Petitioner and neither indicated in their respective opinions any evidence that

suggested the use of coercive tactics by Detective Logan or that he exploited Petitioner's low

mental functioning in any way during the interrogation.  Indeed, there is nothing in the record,

nor in the briefs that were submitted on behalf of Petitioner on appeal, of coercive characteristics

such as an interrogation that lasted for multiple days or a protracted amount of time; that

Petitioner was denied access to the restroom, food and water; that he was detained in an

unreasonably small interrogation room that was at times filled with other officers; or that

attempts at contact by his lawyer or family members were thwarted.  *See e.g.*, Blackburn v.

Alabama, 361 U.S. 199 (1960); Fikes v. Alabama, 352 U.S. 191 (1957).  According the state

court's factual findings the proper amount of deference, this Court cannot conclude that Judge

O'Toole's decision to admit Petitioner's statement was contrary to, or involved an unreasonable

application of, clearly established law.  It also cannot conclude that the decision was based on an

unreasonable determination of the facts in light of the evidence presented.  As such, Petitioner is

not entitled to habeas relief on this claim.

### 3.  Claim Three:  Waiver of Jury Trial

Petitioner's third claim is that the trial court erred in accepting his waiver of a jury trial

knowing that he suffered from borderline intellectual functioning.  Specifically, he contends that

the trial court should have made further inquiry into his mental state and then refused to accept

the waiver.  While Petitioner first raised this claim in his PCRA petition, the PCRA court

deemed it waived because Petitioner had not included it in his claims raised in his direct appeal,

which was the first time he could have raised it before the state court.  (Resp't Ex. 26, ECF No.

29-6, p.59); *see also* 42 Pa. C.S. § 9544(b) ("[A]n issue is waived if the petitioner could have

raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding.")  Nevertheless, the PCRA court found that Petitioner's waiver was valid and that he "was capable of understanding what he was doing when he executed the written waiver and the oral colloquy [that] was conducted in court."  Id.  In his PCRA appeal, the Superior Court also concluded that the issue was waived because Petitioner could have, but failed to raise it on direct appeal.  (Resp't Ex. 33, ECF No. 29-8, p.67).  However, similar to the PCRA court, the Superior Court also determined that Petitioner's waiver was valid and that the claim provided him with no basis for relief.  Id. at pp.67-70.

As an initial matter, this claim is unexhausted because Petitioner did not raise it in his direct appeal proceedings, which was his first opportunity to raise it.  See 28 U.S.C. § 2254(b)(1)(A) (A federal court may not grant a writ of habeas corpus unless the petitioner "has exhausted the remedies available in the courts of the State.");  see also Taylor v. Horn, 504 F.3d 416, 427 (3d Cir. 2007) (To exhaust, "the petitioner must fairly present all federal claims to the highest state court before bringing them in federal court.")  Nonetheless, even when a petitioner brings a claim in state court, a federal court ordinarily may not review it on the merits if the state court's denial of relief is based on a procedural default that rests on a state law ground that is independent of the federal question and adequate to support the judgment.[4]  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  Such a scenario happened in this case when both the PCRA court and Superior Court determined that the claim was waived pursuant to

---

[4] State procedural rules have been held to be inadequate if they are not "firmly established and regularly followed," Ford v. Georgia, 498 U.S. 411, 424 (1991), or if they are "novel [ ]" and unforeseeable.  NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 457 (1958); see also Ford, 498 U.S. at 424.

Pennsylvania's waiver rule, 42 Pa. C.S. § 9544(b). Furthermore, the Third Circuit has found the waiver rule in § 9544(b) to be an independent and adequate state ground for the purpose of the procedural default doctrine. *See* Patton v. Sup't Graterford SCI, No. 17-2142, 2017 5624266, at *1 (3d Cir. 2017) (denying a certificate of appealability because, *inter alia*, "[j]urists of reason would not disagree that Patton's remaining claims are procedurally defaulted as the state court's reliance on 42 Pa. Cons. Stat. § 9544(b) provides an independent and adequate ground to support the judgment.") (citing Campbell v. Burris, 515 F.3d 172, 176 (3d Cir. 2008)). Petitioner's claim is therefore procedurally defaulted.

While a petitioner can overcome a procedural default by demonstrating either: (1) "cause" for the default *and* "actual prejudice" as a result of the alleged violation of federal law; or (2) that the failure to consider the claim will result in a "fundamental miscarriage of justice," Coleman, 501 U.S. at 750, an undertaking of such an analysis is not necessary in this case. Since the Superior Court elected to evaluate the merits of this claim in the alternative, this Court will instead apply AEDPA deference to the Superior Court's alternative holding. *See* Rolan v. Coleman, 680 F.3d 311, 320-21 (3d Cir. 2012) (applying AEDPA deference to Superior Court's alternative holding on the merits of the petitioner's claim). The Court will begin by examining the clearly established federal law with respect to the waiver of one's right to a jury trial.

The right to a jury is fundamental, Duncan v. Louisiana, 391 U.S. 145, 149 (1968), but that right can be waived by a criminal defendant. Patton v. United States, 281 U.S. 276, 312 (1930). The Supreme Court, however, has made clear that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. 742, 748 (1970). Whether or not there is an intelligent, competent, self-protecting waiver of jury trial by

an accused must depend upon the unique circumstances of each case." <u>Adams v. U.S. ex rel. McCann</u>, 317 U.S. 269, 278 (1942).

### a. "Contrary to"

When it addressed this claim in the alternative, the Superior Court set forth the Pennsylvania law governing a defendant's right to waive a jury trial and cited to Pa. R. Crim. P. 620 and <u>Commonwealth v. Houck</u>, 948 A.2d 780, 787 (Pa. 2008). (Resp't Ex. 33, ECF No. 29-8, pp.67-68). While the Superior Court did not cite federal law, this Pennsylvania law comports with the federal mandate that the waiver must be knowing, intelligent and voluntary. Pennsylvania law also provides that the defendant must be advised that: (1) the jury would be chosen from members of the community, (2) the accused would be allowed to participate in the selection of the jury panel, and (3) the verdict would have to be unanimous. <u>Id</u>.

In this case, the Superior Court examined the record and determined that the trial court did not err because it found significant evidence that Petitioner "knowingly, voluntarily, and willingly[ ]waived his right to a jury trial and was competent to do so[.]" <u>Id</u>. at p.69. In reaching this conclusion, the Superior Court did not apply law that was "contrary to" the clearly established federal law governing waivers of such fundamental rights.

### b. "Unreasonable application of"

In applying the law governing waivers and arriving at its conclusion that the trial court's acceptance of Petitioner's waiver was not in error, the Superior Court explained:

> On March 31, 2009, the trial court conducted a lengthy and thorough oral colloquy of Appellant regarding his waiver of a jury trial. N.T., 3/31/09, at 5-29. The trial court made the accused aware of the essential ingredients inherent to a jury trial. <u>Id</u>. Throughout the proceeding, the trial court judge and Appellant communicated with each other, and the transcript reveals that Appellant appropriately responded to the various questions, indicating his understanding of

the trial court judge's statements. Id. The trial court also indicated that it would incorporate the written colloquy into the record. Id. at 31. Appellant's counsel stated, and Appellant confirmed, that counsel had read the written colloquy to Appellant and that Appellant had initialed the statements. Id.

The written colloquy consisted of fifty-six questions that Appellant answered individually by hand-writing "yes" or "no" to each. Waiver of jury trial and explanation of Defendant's rights, 3/30/09, at 1-8. Specifically, paragraph forty-five stated: "Your waiver must be voluntarily, knowingly, and intelligently waived. Do you fully understand this?" Id. at 7. Appellant answered with a hand-written "yes." Id. As previously noted, during the oral colloquy, counsel confirmed that he had read the written colloquy to Appellant and that Appellant understood and completed the written colloquy. N.T., 3/31/09, at 31. Appellant did not dispute this statement at the oral colloquy before the court.

Additionally, of relevance is the fact that a hearing on Appellant's motion to bar imposition of the death penalty was held on July 23, 2007. N.T., 7/23/07. The subject of that hearing was Appellant's level of intellectual functioning and whether he had mental retardation, and therefore was not eligible for the death penalty. Id. Several experts testified. Id. Following the hearing, the trial court issued an order denying Appellant's request that he not be subject to the death penalty. Order, 2/29/08, at 1.

While there is significant evidence of record that Appellant knowingly, voluntarily, and willingly waived his right to a jury trial and was competent to do so, Appellant has presented no evidence that, due to his alleged impaired intellectual functioning, he was not competent to waive this right. Thus, Appellant has failed to establish that his jury waiver was invalid. Houck, 948 A.2d at 788 ("it is the defendant's burden, and not the Commonwealth's, to establish that a jury waiver is invalid."). As a result, if we considered this issue, we would not conclude that the trial court's acceptance of Appellant's waiver of his right to a jury trial was in error or in violation of Appellant's constitutional rights.

(Resp't Ex. 33, ECF No. 29-8, pp.68-70).

In concluding that Petitioner's waiver was constitutionally valid, the Superior Court reviewed both the written and oral colloquies and took into consideration the trial court's hearing and subsequent denial of the defense's pretrial motion to bar the imposition of the death penalty, wherein the defense had argued that Petitioner was suffered from mental retardation. The

Superior Court further noted that Petitioner had not presented any evidence to support his claim that his low intellectual functioning rendered him unable to validly waive his right to a jury. Despite his arguments of limited intelligence, on which he primarily relies to support this claim, there is simply no basis to find that the Superior Court unreasonably applied clearly established federal law.[5]  Finally, to the extent that he makes the argument, the Superior Court's decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 4.  Claim Four:  Ineffective Assistance of Counsel

Petitioner's fourth claim is that his counsel was ineffective for failing to call as alibi witnesses his mother, Mary Brown, and his sister, Niesha Hemmingway, whom Petitioner states would have accounted for his whereabouts at the time of the crime.

Ineffective assistance of counsel claims are governed by the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result would have been different.  Id. at 687.  For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  Id. at 688.  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

---

[5] In any event, it does not appear that Petitioner would have ultimately elected to proceed with a jury trial.  Indeed, he states that it was a reasonable trial strategy to waive his right to a jury because a judge was likely going to be more desensitized to the details of the crime.  He states that knew he had a better opportunity to fend off the death penalty proceeding before a judge, and that strategy ultimately proved successful.

been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. With respect to the sequence of the two prongs, the Strickland Court held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id. at 697. For AEDPA purposes, the Strickland test qualifies as "clearly established Federal law, as determined by the Supreme Court." Williams v. Taylor, 529 U.S. 362, 391 (2000).

### a. **"Contrary to"**

The Superior Court analyzed this claim under the test for ineffective assistance of counsel claims set forth by the Pennsylvania Supreme Court in Commonwealth v. Pierce, 527 A.2d 973 (Pa. 1987). (Resp't Ex. 33, ECF No. 29-8, p.70). Pierce provides that counsel is presumed to have provided effective representation unless the petitioner pleads and proves that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable basis for his or her conduct; and (3) the petitioner was prejudiced by counsel's action or omission. Id. at 975-76. The Third Circuit has held that the Pierce standard is not "contrary to" Strickland, the standard enunciated by the Supreme Court in judging ineffectiveness claims. *See* Wertz v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000). Therefore, the Superior Court's adjudication in this case satisfied review under the "contrary to" clause of § 2254(d)(1), and the inquiry now becomes whether its decision was an objectively unreasonable application of that law.

### b. **"Unreasonable application of"**

The Superior Court began its analysis by first setting forth the PCRA's court explanation for why Petitioner's claim of counsel's ineffectiveness for failing to call alibi witnesses lacked

merit.  *See* Resp't Ex. 33, ECF No. 29-8, pp.72-73.  Specifically, the PCRA court opined as

follows.

> The defendant's claim that trial counsel was ineffective for failing to present alibi testimony from his mother, Mary Brown, and his sister, Niesha Hemmingway, is without merit because the defendant could not have possibly been prejudiced by trial counsel not calling them.  The record clearly established that counsel had a reasonable basis for not presenting the alibi evidence.  First, the defendant provided at least three different alibis before eventually admitting his involvement in these offenses.  Those contradictory statements by the defendant would have gravely affected the credibility of any alibi presented at trial that was not consistent with the defendant's statements.  None of the three alibis he provided while being interrogated was consistent with the claim that he was in his mother's or sister's presence.  Moreover, the physical evidence in this matter clearly established that the defendant was present in the home of the victims.  The defendant gave a statement in which he admitted entering the residence by cutting a screen.  This claim[] was corroborated [by] the fact that a screen had been damaged on the second floor.  Moreover, the defendant's statement that he had struck the victims with a cane was corroborated as a cane was found in the home. The injuries and wounds that the victims suffered were also consistent with the defendant's description in his statement of what he did to them.  Moreover, [a] bloody palm impression left at the scene was found to match that of the Petitioner and a belt buckle recovered from the Petitioner's room at his home tested positive for blood and DNA testing of the blood revealed that it matched a victim's genetic profile[].  Finally, the Commonwealth presented Glover Huston, an acquaintance of both the victims and the defendant.  Mr. Huston testified that the Sunday before the incident he was confronted by the defendant who was angry and complained that Huston and the victims were talking about him.  Huston testified that the defendant said that he did not like the victims' attitudes and also that it would be easy for someone to break into the house, kill the victims and get away with it.

> Clearly, the overwhelming weight of the evidence presented established the defendant's presence at the scene of these murders.  Offering alibi testimony from his mother and sister, which would have contradicted each of the statements the defendant gave, would have been pointless.  Trial counsel could not have been ineffective for failing to call alibi witnesses as the record established wholly reasonable grounds for counsel to not present such evidence and, rather, to argue, as he did at trial, that the defendant's mental state lessened his culpability.

(Resp't Ex. 26, ECF No. 29-6, pp.59-61). The Superior Court found that this summation of the evidence regarding Petitioner's involvement in the crimes was supported by the record and agreed with the PCRA court's conclusion that counsel had a reasonable basis for declining to call alibi witnesses who would have contradicted Petitioner's various statements. (Resp't Ex. 33, ECF No. 29-8, p.73). The Superior Court also stated that Petitioner was not prejudiced by counsel's decision not to present these alibi witnesses' statements because their alleged testimony would not have resulted in a reasonable probability that the result of the proceeding would have been different. Id.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult because the standards created by Strickland and § 2254(d) are both "highly deferential," 466 U.S. at 689; Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). Indeed, the Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 123 ("And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."). Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable, but rather whether there is any reasonable argument that counsel satisfied Strickland's deferential standard. Harrington v. Richter, 562 U.S. 86, 105 (2011).

Under the doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard, Petitioner's ineffective assistance of counsel claim does not merit habeas relief. Simply put, given the amount of evidence placing Petitioner at the crime

scene and his own statements to police, which his alibi witnesses would have contradicted, it was not unreasonable for the Superior Court to conclude that the result of Petitioner's trial would not have been different had his mother and sister testified. To the extent Petitioner also argues in favor of § 2254(d)(2), the Superior Court's decision was not an unreasonable determination of the facts in light of the evidence presented. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### 5. **Claim Five: Ineffective Assistance of PCRA Counsel**

Petitioner's final claim is twofold. Petitioner first claims that his PCRA counsel, Attorney Ryan H. James, was ineffective for failing to file a timely amended PCRA petition[6] raising additional claims that Petitioner wanted him to raise, which resulted in those claims being procedurally defaulted. Petitioner also argues that he is entitled to habeas relief on the claims that were not raised by Attorney James and that their procedural default should be excused due to Attorney James' ineffective assistance.

The following background is relevant to this claim. While representing Petitioner in his PCRA proceedings, Attorney James did not timely seek leave to amend the already Amended PCRA Petition in response to the PCRA court's notice of intent to dismiss, which the PCRA court issued on February 10, 2014. Instead, Attorney James filed his reply on April 17, 2014, sixty days after the issuance of the notice of intent to dismiss and three days after the PCRA court issued its order on April 14, 2014 dismissing Petitioner's Amended PCRA Petition. In his reply, Attorney James raised new issues that the Superior Court found "were claims simply

---

[6] Had Attorney James filed it, this would have actually been a second amended PCRA petition since he had already filed an Amended PCRA Petition on behalf of Petitioner on September 24, 2013.

reframing the evidence and testimony regarding the crime that were already presented to and considered by the PCRA court in issuing its notice of intent to dismiss." (Resp't Ex. 33, ECF No. 29-8, p.76). These included claims that (1) defense counsel failed to have an independent expert examine the only DNA evidence of the victims that was recovered from Petitioner, a blood stain on Petitioner's belt buckle; (2) the purported murder weapon used to commit the crime, a cane, "presented with no evidence of the presence of blood or tissue, which is contrary to what the Commonwealth's medical examiner would have expected[,]" and this was "problematic as no evidence came out of trial that the cane had been washed or altered in any way[;]" and (3) defense counsel failed to have an independent expert test the two bloody palm prints found at the crime scene, which the Commonwealth linked to Petitioner via expert testimony on finger-print identification. (Resp't Ex. 28, ECF No. 29-6, p.66). Attorney James then filed a motion to reconsider the PCRA court's dismissal, wherein he acknowledged that his reply to the PCRA court's notice of intent to dismiss was filed after the PCRA court had issued its order dismissing Petitioner's Amended PCRA Petition but claimed that he had no notice of the PCRA court's final order until days after his reply was filed. (Resp't Ex. 29, ECF No. 29-6, pp.70-74).

In his motion for reconsideration, Attorney James requested that the PCRA court rescind its final order to consider and address the additional issues he raised in Petitioner's reply. Id. at p.72. However, the PCRA court took no action on the motion, and, on appeal, the Superior Court concluded that the PCRA court did not abuse its discretion in declining to rescind its order dismissing the Amended PCRA Petition in order for Petitioner to amend to add the additional claims. (Resp't Ex. 33, ECF No. 29-8, pp.74-79). The Superior Court also noted that despite Attorney James' contention that he did not receive notice of the PCRA court's final order,

Petitioner had only thirty days within which to file a response to the PCRA court's notice of intent to dismiss and Attorney James did not file his reply until sixty days thereafter. Thus, it concluded that no unfair prejudice resulted to Petitioner despite Attorney James not receiving notice of the PCRA court's final order. Id. at p.79.

### a. 28 U.S.C. § 2254(i)

To begin, the first part of Petitioner's claim is not cognizable on federal habeas review pursuant to 28 U.S.C. § 2254(i), which provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." *See* Martinez v. Ryan, 132 S. Ct. 1309, 1320 (2012) (discussing section 2254(i)); Martel v. Clair, 132 S. Ct. 1276, 1287, n.3 (2012) (same); Taylor v. Horn, 504 F.3d 416, 437 n.17 (3d Cir. 2007) (same), *cert. denied*, 555 U.S. 846 (2008). Therefore, standing alone, Attorney James' alleged ineffective assistance for failing to file a timely amended PCRA petition on Petitioner's behalf does not provide a basis for habeas relief.

### b. Martinez

The second part to Petitioner's claim, however, involves a more in-depth analysis. Essentially, Petitioner is attempting to raise procedurally defaulted claims and use Attorney James' alleged ineffective assistance to overcome their default. In this regard, the Supreme Court has held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's default of a claim of ineffective assistance at trial." Martinez, 132 S. Ct. at 1315. However, "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Id. at 1318. The case on which the Supreme Court based its description of what a "substantial claim" entails

concerns the standards for issuing a certificate of appealability. Id. at 1318-19 (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). In order for a petitioner to demonstrate that his claim has "some merit" under this standard, he must "show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 336 (internal citation, quotation marks and alteration omitted). By relying on this standard, the Supreme Court implied that the underlying ineffective assistance of trial counsel claim must be evaluated under a standard less exacting than Strickland prejudice. Workman v. Superintendent Albion SCI, 915 F.3d 928, 939 (3d Cir. 2019). However, a substantial claim alone is not sufficient to excuse a petitioner's procedural default. The Supreme Court held that state post-conviction counsel must also be "ineffective under the standards of Strickland v. Washington" to excuse the procedural default of the underlying claim. Martinez, 132 S. Ct. at 1318. In sum, if a petitioner "shows that his underlying ineffective-assistance-of-trial-counsel claim has some merit and that his state post-conviction counsel's performance fell below an objective standard of reasonableness, he has shown sufficient prejudice from counsel's ineffective assistance that his procedural default must be excused under Martinez." Workman, 915 F.3d at 941.

### c. Procedurally Defaulted Claims

Of the three aforementioned claims that Attorney James raised in the untimely reply he filed in response to the PCRA court's notice of intent to dismiss, only two are claims involving ineffective assistance of trial counsel. The other claim, which involved the lack of the presence of blood or tissue on the cane, was not framed in terms of ineffective assistance. In fact, the issue was not framed in terms of a claim at all but was instead another point of challenge to the

sufficiency of the evidence that was used to convict Petitioner, an issue that was dealt with on direct appeal. Since a claim of ineffective assistance of post-conviction counsel can be used to excuse the procedural default of only ineffective assistance of trial counsel claims, the procedural default of the claim/issue involving the cane cannot be excused by Attorney James' failure to raise it in a timely filed amended PCRA petition. Since Petitioner has not argued, much less demonstrated any other cause for the default of this issue, nor demonstrated that the failure to consider it would result in a fundamental miscarriage of justice, the claim is procedurally defaulted.

Before reviewing the two procedurally defaulted claims of ineffective assistance of trial counsel, this Court notes that Petitioner's Brief contains another claim for which its procedural default is blamed on Attorney James' ineffectiveness. Specifically, he argues that the evidence at trial portrayed a bloody crime scene yet neither his clothes nor his shoes tested positive for the presence of blood. However, like the claim involving the cane, this too is simply a point of challenge to the sufficiency of the evidence used to convict him and not an actual claim. Furthermore, it is not a claim involving the ineffective assistance of trial counsel, and, therefore, Attorney James' failure to include it in a timely filed amended PCRA petition cannot suffice to establish cause for its default. For the same reasons stated in the preceding paragraph with respect to the cane, this claim (to the extent that it is one) is also procedurally defaulted.

Assuming for the sake of argument, and judicial efficiency, that Attorney James' performance was deficient under Strickland, the question becomes whether Petitioner's two claims of trial counsel ineffectiveness are "substantial" as that term has been defined by the Supreme Court. For the following reasons, the Court finds that they are not.

Petitioner maintains that his trial counsel should have had an independent expert examine the blood sample from his belt and the two bloody palm prints found at the crime scene, and he claims that counsel's failure to do so essentially amounted to deficient performance because neither piece of evidence was subjected to meaningful adversarial testing.  However, Petitioner does not argue what prejudice he suffered as a result of counsel's failure because he does not state what the results of such testing would have revealed.  He does not argue that the blood on his belt did not belong to the victim,[7] nor does he argue that the bloody palm <u>prints</u> (not the blood itself) found at the scene did not belong to him.[8]  Indeed, it is pure speculation as to what an independent expert would have testified had trial counsel had them examine the evidence in question.  Furthermore, the transcript shows that trial counsel's strategy was to focus on Petitioner's degree of guilt and a defense of diminished capacity rather than exert unnecessary resources on experts to rebut the Commonwealth's evidence that placed Petitioner at the scene of the crime even acknowledging in his opening statement that they could not really dispute the evidence that he was there.  This was an objectively reasonable strategy given the evidence at trial, which included Petitioner's confession to Detective Logan, and, given this reasonable strategy and the fact that Petitioner has not explained how the result of his trial would have been

---

[7] Statistical analysis performed on that DNA profile showed that Tiffany Griffin was 9.3 quintillion times more likely than another unrelated black person chosen at random to have been a contributor to the sample, while the number generated for the Caucasian population was 1 in 16 quintillion, and in the Hispanic population was 1 in 7.7 quintillion.  (N.T., 4/7/09, at 138-40).

[8] The expert in finger-print identification testified that there were approximately 11 different points of identification on the bloody right palm print that corresponded with the inked impression of Petitioner and that each point encompassed several different characteristics.  (N.T., 4/7/09, at 84-93).

different had counsel had an independent expert examine the forensic evidence, the Court finds that the claims do not have "some merit" so as to overcome their procedural default.

### 6. Claim Six: DNA Testing

Finally, in the two addendums that he filed in this case, Petitioner fervently argues that DNA testing on the bloody palm prints would have proved his actual innocence of the crimes for which he was convicted. It is unclear whether Petitioner is raising this as a freestanding claim of actual innocence, to support a claim of manifest injustice in order to overcome the procedural default of the previous claims, or in some other manner that may involve his trial counsel's ineffectiveness. To the extent he is asserting a stand-alone claim, "[t]he Supreme Court has not definitively resolved whether such freestanding actual innocence claims are cognizable" in federal habeas proceedings, "but to the extent that they are, they are assessed under a more demanding standard" than gateway innocence claims. *See* Reeves v. Fayette SCI, 897 F.3d 154, 160, n.4 (3d Cir. 2018) (citing McQuiggin v. Perkins, 569 U.S. 383, 392 (2015); House v. Bell, 547 U.S. 518, 555 (2006)). For a gateway claim of actual innocence, such evidence must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." Id. (quoting Schlup v. Delo, 513 U.S. 298, 316 (1995)). Petitioner's claim of innocence in this case is far from reaching this standard. DNA testing on the bloody palm print would not exonerate Petitioner of the crimes for which he was convicted even if his DNA did not appear since the blood likely belonged to one or both of the victims.

### D. Certificate of Appealability

A court should issue a certificate of appealability where a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner meets this

burden by showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). A certificate of appealability will be denied in this case because jurists of reason would not disagree with the Court's resolution of Petitioner's claims or conclude that they are "adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack, 529 U.S. at 484). A separate Order will issue.

Dated: October 16, 2019.


/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
United States Magistrate Judge


Cc:   William Lee Brown
      JB3397
      SCI Rockview
      Box A
      Bellefonte, PA  16823

      Counsel of Record
      (*via CM/ECF electronic mail)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM LEE BROWN, | ) | |
| | ) | Civil Action No. 16 – 63 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| MR. GARMON and THE | ) | |
| ATTORNEY GENERAL OF THE | ) | |
| STATE OF PENNSYLVANIA, | ) | |
| | ) | |
| Respondents. | ) | |

## <u>ORDER</u>

**AND NOW**, this 16th day of October, 2019;

**IT IS HEREBY ORDERED** that the Petition for Writ of Habeas Corpus (ECF No. 3) is denied.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is denied.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of Respondents and mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

/s/ Lisa Pupo Lenihan
Lisa Pupo Lenihan
United States Magistrate Judge
